612

In Re: Appeal of Ethken Corporation From the Decision of the Zoning Hearing Board of the Borough of Kutztown. Ethken Corporation, Appellant.

Argued April 11, 1985, before Judges CRAIG and COLINS and Senior Judge KALISH, sitting as a panel of three.

*Donald F. Spang, Merkel & Spang,* for appellant.

*Walter M. Diener, Jr.,* with him, *David M. Kozloff, Kozloff, Diener, Payne & Fegley,* for appellee.

OPINION BY JUDGE CRAIG, June 3, 1985:

In this zoning case Ethken Corporation appeals from an order of the Court of Common Pleas of Berks County, which affirmed a decision of the Zoning Hearing Board of the Borough of Kutztown denying Ethken's[1] application for a special exception and request for variances. The issues for our determination are (1) whether the board erred in concluding that the proposed use was not within those which the zoning ordinance permits by special exception, and (2) whether the board erred in denying Ethken's requested variances.

Ethken is the owner of a corner lot of approximately 1.4 acres (144 feet wide and 413 feet deep), which existed as a single lot in 1972 when Kutztown adopted its zoning ordinance. The lot is located in an R-2 Low Density Residential District,[2] which permits a

---

[1] Ethken is a closely held corporation, wholly owned by Dr. Kenneth Lambert.

[2] Section 402.1 of the Borough of Kutztown Zoning Ordinance of 1972 provides:

Permitted Uses

a. Single-family dwelling—detached building.

b. Public schools, parochial schools, institutions for higher education; private schools which do not provide corrective, rehabilitative or remedial care or instruction;

c. Public parks and playgrounds;

d. Public structures owned or operated by the Borough or Municipal Authority organized by the Borough.

e. Fire stations.

"nursing home, convalescent home, or similar health care facility" only by special exception.[3]

Ethken proposed to construct a geriatric personal care facility, which would include an infirmary and medical office; the proposal specified a seventy-five bed facility, covering approximately 34% of the area of the lot and providing 60 parking spaces. After taking testimony, the board concluded that the proposal was outside the ordinance definition of a nursing or convalescent home and was therefore not entitled to a special exception. The board also denied variance from lot coverage, lot dimension and parking requirements. On appeal, the court of common pleas, without taking additional evidence, affirmed the board's decision.[4]

With reference to Ethken's contention that the board erred in concluding that the proposal was not a nursing home, and therefore not permitted by special exception,[5] we note that the ordinance defines a nursing or convalescent home as an

Establishment providing nursing, dietary, and other similar personal services to convalescents, invalids, or aged persons, but excluding mental cases, cases of contagious or communicable disease, surgery, or other treatments which are customarily provided in sanitariums and hospitals.

Borough of Kutztown Zoning Ordinance of 1972, §201.4.

---

[3] Ordinance Section 402.3h.

[4] Although the common pleas court did not address the variance question in its opinion, that court's order specifically affirmed the board's denial of the variances. Accordingly, we will also address that issue.

[5] Where the trial court receives no additional evidence, our scope of review is to determine whether the board abused its discretion or committed an error of law. *Zajac v. Zoning Hearing Board of Mifflin Township*, 41 Pa. Commonwealth Ct. 7, 398 A.2d 244 (1979).

Dr. Lambert testified for Ethken, explaining the physical characteristics of the structure, the details of the care which the facility would provide, the proposed staffing and the community need which he hoped the proposal would serve. Ethken's architect, Wolfgang Rapp, also testified about the design of the facility.

Their testimony indicated that the facility would include an institutional kitchen and dining room, hospital-size elevator and corridors, activity areas, chapel, administrative offices, conference room, reception desk, loading or delivery area, and sprinkler system, and would be of fireproof construction. With respect to the medical care, Dr. Lambert explained that he would locate his medical office within the facility and that he would maintain an infirmary which would be open 24 hours a day. He further testified that the staff would include a full-time physician, 24-hour nursing care,[6] and approximately 25 full-time employees, including dieticians, nursing aides, maintenance workers and security personnel.

Dr. Lambert further testified that the purpose of the facility was to provide "custodial care", as distinguished from the more common skilled care or intermediate care facility. The facility would serve, he testified, those people who, because of age, are becoming infirm or forgetful, who often fail to eat properly, either through neglect or lack of finances, and who are no longer physically able to maintain their homes and are often targets of crime. These individuals fortunately do not require the more intense level of care of the skilled or intermediate care nursing homes

---

[6] Although the trial court's opinion reveals some confusion concerning the proposed nursing staff, Dr. Lambert's testimony was clear that he proposed to have one skilled nurse present 24 hours a day, with individual nurses working eight-hour shifts.

and, in comparison with the patients of those homes, would be "pretty well independent of care"; however, they can no longer live safely without some level of medical supervision and care.

Based on the evidence, the board found that the proposed facility would provide "basically residential care", a term which it did not define, and concluded that the evidence was insufficient to demonstrate that the proposed facility was a "health care facility similar to a nursing home or convalescent home." The board concluded that the proposed use was "a boarding home for aged persons" and that such a use was not permitted in the R-2 district by special exception or otherwise.

"Whether a proposed use, as factually described in an application or in testimony, falls within a given category specified in a zoning ordinance is a question of law and subject to review on that basis." *Crary Home v. DeFrees*, 16 Pa. Commonwealth Ct. 181, 184, 329 A.2d 874, 876 (1974).

We are mindful that in construing a statute or an ordinance, our polestar is the intent of the legislature, *Appeal of Neshaminy Auto Villa Ltd.*, 25 Pa. Commonwealth Ct. 129, 358 A.2d 433 (1976), and that we must ascribe their common meaning to terms not legislatively defined. 1 Pa. C. S. §1903. With respect to the interpretation of zoning ordinances, we must afford permitted uses the broadest interpretation so that a landowner may have the "benefit of the least restrictive use and enjoyment of his land." *Barnhart v. Zoning Hearing Board of Nottingham Township*, 49 Pa. Commonwealth Ct. 481, 483, 411 A.2d 1266, 1267 (1980); *Gilden Appeal*, 406 Pa. 484, 178 A.2d 562 (1962).

In order to construe the ordinance definition of nursing home, which we quoted above, we must rely

on the common usage of the words "nursing, dietary, and other similar personal services", because the ordinance fails to explain their meaning. Webster's Third New International Dictionary, p. 1551, although failing to define the adjective form, defines the noun "nurse" as "a person skilled in caring for and waiting on the infirm, the injured, or the sick."

Given Dr. Lambert's testimony that the facility would have a full-time physician, a "skilled nurse" at all times and "nursing aide backup", we are satisfied that the facility would clearly provide "nursing care" for those who resided there. Nothing in the record supports the contention in the board's brief here, consistent with the trial court's comments, that "nursing" would not be regularly or routinely provided to the residents; similarly, the record does not support the contention that the nursing services would be merely incidental or provided only on an emergency basis.

With respect to the required dietary care, Webster's defines the noun "diet" as "food and drink regularly provided or consumed." Webster's Third New International Dictionary, p. 629. Because the proposed facility would provide total meal service to its residents, including planning, preparation and service of every meal, the board could not seriously contend that the home would not provide dietary care within the meaning of the ordinance. The facility also clearly satisfies the third requirement that it provide "similar personal services" because integral to the "custodial" level of care would be, for example, the bathing and dressing of the residents and the cleaning of their rooms.

With respect to the board's determination that the proposal was a boarding house, we note that Webster's defines "boarding house" as "a house that provides board and sometimes rooms" and defines

"board" as "food in the form of daily meals often provided as payment for services." Webster's Third New International Dictionary, pp. 243-44. That definition, lacking reference to any of the personal and medical services which the facility would provide, is a patently inaccurate characterization of the facility.

Because the facility, as described in the testimony, clearly will provide "nursing, dietary, and other similar personal services," we must conclude that the proposed facility is a nursing home or similar health care facility as defined by the zoning ordinance. Accordingly, the use is one permitted by special exception in the R-2 district.

We must now direct our inquiry to the ordinance's specific requirements for nursing homes as special exceptions, found in section 402.3h. *Bray v. Zoning Board of Adjustment*, 48 Pa. Commonwealth Ct. 523, 410 A.2d 909 (1980). That section provides the following requirements:

| | | |
|---|---|---|
| Minimum Lot Size | — | 40,000 sq. ft. |
| Minimum Lot Width | — | 150 ft. |
| Minimum Front Yard | — | 50 ft. |
| Minimum Each Side Yard | — | 30 ft. |
| Minimum Rear Yard | — | 100 ft. |
| Maximum Building Coverage Including Accessory Structures | — | 20 percent |
| Maximum Building Height | — | 2-1/2 stories |

Ethken contends that ordinance section 602, which makes certain specified allowances for lots which existed on the date of the enactment of the zoning ordinance, exempts it from compliance with the total area and width requirements listed above.[7] Ethken fur-

---

[7] Section 602, Non-Conforming Lots of Record, provides in relevant part:

ther contends that ordinance section 501.6, which describes restrictions applicable to corner lots, reduces the minimum side yard requirement to 20 feet.[8] Even if those contentions are correct, Ethken's proposal nevertheless fails to conform to the 20% maximum building coverage requirement because, as explained above, the proposed structure would cover 34% of the lot area.

Furthermore, with respect to the ordinance's general requirements, section 508.1 specifies that a nursing home must provide one parking space per bed. As the board correctly noted, the ordinance would require Ethken to provide 75 parking spaces; the proposal included only 60 spaces.

Therefore, at minimum, Ethken's proposal required variances from the ordinance's building coverage and parking space requirements.

---

In any zoning district, structures and uses which are permitted in that district may be erected or established on any single lot of record at the effective date of adoption or amendment of this Ordinance, notwithstanding limitations imposed by other provisions of this Ordinance. This provision shall apply even though such lot fails to meet the requirements for area or width, or both, that are generally applicable in the district. . . .

[8] Section 501.6, Corner Lot Restriction, provides in relevant part:

The yard adjoining a street which is not designated the front yard and is not opposite the front yard must meet the front yard requirements of the applicable zoning district unless it abuts a service street (in which case, except in a C-1 District, the minimum required yard shall be twenty (20) feet unless otherwise required by this Ordinance), and the yard opposite this yard shall meet the side yard requirements of the applicable zoning district, except that if the opposite yard abuts a street it must meet the applicable front yard requirements of the zoning district unless it abuts a service street (in which case, except in a C-1 District, the minimum required yard shall be twenty (20) feet unless otherwise required by this Ordinance).

. One who seeks a variance has the burden of establishing that the existence of unique physical circumstances or conditions on the property create an unnecessary hardship so that a variance from the terms of the ordinance is necessary to enable a reasonable use of the property. *Ramondo v. Zoning Hearing Board of Haverford Township,* 61 Pa. Commonwealth Ct. 242, 434 A.2d 204 (1981); section 912 of the Pennsylvania Municipalities Planning Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. §10912.

The board found that Ethken had failed to show the presence of any unique physical circumstances or conditions which created an unnecessary hardship. After careful review of the record, we concur with the board's determination that Ethken failed to produce evidence that would establish its entitlement to the necessary variances.[9]

Accordingly, although we conclude that the board erred in its determination that the proposal did not come within those uses authorized by special excep-

---

[9] We cannot agree with Ethken's contention that its proposed 34% lot coverage is a de minimis departure from the 20% maximum of the ordinance. As we observed in *King v. Zoning Hearing Board of the Borough of Nazareth,* 76 Pa. Commonwealth Ct. 318, 320, 463 A.2d 505, 505-6 (1983),

"[t]he de minimis doctrine is an extremely narrow exception to the heavy burden of proof which a party seeking a variance must normally bear. The courts have applied the rule and allowed a variance in a limited number of cases where the violation of the ordinance was a relatively minor one, and to do otherwise would require the moving of an entire building. The court also followed the de minimis rule in a unique case where rigid compliance with the ordinance was not absolutely necessary to protect the public policy concerns underlying the ordinance." (Footnotes omitted.)

As in *King,* the facts of this case do not parallel those where the de minimis analysis has prevailed.

tion, we agree with the board's disposition of the variance request and therefore affirm.

ORDER

Now, June 3, 1985, the order of the Court of Common Pleas of Berks County, No. 305 May, 1983, dated February 28, 1984, is affirmed.